IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| MELVA ELDRIDGE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00106 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WALMART, INC., | ) | |
| | ) | By:   Hon. Thomas T. Cullen |
| Defendant. | ) | United States District Judge |
| | ) | |

Plaintiff Melva Eldridge brought suit under Title VII, alleging that defendant Walmart, Inc. ("Walmart") discriminated against her on the basis of sex. Walmart now moves for summary judgment on Eldridge's remaining disparate treatment claim for pay and promotional discrimination. Because Eldridge has not stated a *prima facie* case of gender discrimination, the court will grant Walmart's motion for summary judgment.

### I.   BACKGROUND

**A.   Relevant Walmart Policies**

**1.   Pay Structure**

Each Walmart store has its own pay structure, which is reviewed annually to ensure that it remains competitive in each store's respective labor market. (Decl. of Lisa Riley ¶¶ 14–15, Jan. 26, 2021 [ECF No. 4-1] [hereinafter "Walmart Decl."].) Within that pay structure, every position is assigned to a "pay class" based on job responsibilities, and jobs in the same pay class have the same minimum starting wage. (*Id.* ¶¶ 16–17.) While an associate must be paid at least that minimum wage, Assistant Store Managers—who typically set an

associate's starting wage—can increase an associate's wage based on additional skills, experience, or education. (*Id.* ¶¶ 18–19.)

After an associate starts, there are opportunities for pay increases (1) after a 90-day evaluation; (2) after annual performance evaluations; (3) if an associate receives a "merit increase" for "exceptional performance" or accepting additional responsibilities (*e.g.*, joining a Safety Team); (4) if the associate is promoted or moved into a higher pay class; and (5) if a facility's pay structure is modified to stay competitive in a market. (*Id.* ¶¶ 22–27.) The result is that "the grouping of positions into pay classes with different minimum starting rates does not mean that associates working the same pay class positions always earn the same hourly rates." (*Id.* ¶ 29.)

### 2. Management Structure

It is also helpful to review Walmart's management framework. Relevant here, each Walmart store has one Store Manager. (*Id.* ¶ 7.) Some stores have Co-Managers (mid-level, salaried management), and other stores have Area Managers and/or Assistant Store Managers (the lowest levels of salaried employment). (*Id.*) Store Managers make "key decisions within the store, while delegating many responsibilities to other salaried managers within their store, including Area Managers, [Assistant Store Managers,] and/or Co-Managers." (*Id.*)

To become an Assistant Store Manager, an associate must be selected for and complete Walmart's Management in Training ("MIT") program. (*Id.* ¶¶ 31.) Any interested associate can apply and discuss the opportunity with his or her Store Manager or other salaried managers. (*Id.* ¶ 32.) If there is a program opening, the Market Manager will contact an applicant's Store Manager to see if he or she recommends the associate. (*Id.*) If recommended, the associate can

interview with the Market Manager, who will determine if the associate should be selected for the position. (*Id.*)

There are also several lower levels of non-salaried management. Support Managers are hourly associates who have supervisory responsibilities across the entire store (rather than over a specific department) and share operational responsibilities with the salaried management to whom they report. (*Id.* ¶ 8.) When an associate seeks a promotion to Support Manager, the Assistant Store Manager or Co-Manager is generally responsible for interviewing and selecting an associate to fill the position, with the Store Manager's approval. (*Id.* ¶ 30.) Further, each store employs "Personnel Managers" and "Personnel Coordinators," who are hourly associates without decision-making authority. (*Id.* ¶ 9.)

Finally, Walmart stores are broken down into separate departments, based on their respective merchandise (*e.g.*, Electronics, Toys, *et cetera*). (*Id.* ¶ 12.) Each department is supervised by an associate who holds the position of Department Manager. (*Id.*) Job responsibilities, the number of associates, and policies vary by department. (*Id.* ¶ 13.) As such, if a Department Manager transfers to another department, Walmart may adjust her pay rate as her work duties change. (*Id.* ¶ 20.) Support Managers are customarily paid higher rates than Department Managers because Support Managers have a wider scope of responsibility throughout the store. (*Id.* ¶ 21.)

**B.     Eldridge's Walmart Employment History**

Prior to working at Walmart, Eldridge managed a convenience store for approximately three years. (*Id.* ¶ 34; Dep. of Melva Eldridge 19:23–20:4, July 31, 2020 [ECF No. 4-3].) Walmart hired Eldridge on March 8, 1999, at a store in New Castle, Delaware, as a Department

3

Manager.[1] (Walmart Decl. ¶ 35.) She received her requested initial rate of $8.00 per hour. (*Id.* ¶ 36.) Eldridge ultimately worked in the New Castle store for over 13 years, until October 2012. (*Id.* ¶ 37.) In 2012, Eldridge transferred to a Walmart store in California where she remains employed to this day. (*Id.* ¶ 41.)

During her tenure at the New Castle store, she worked as a Department Manager in various divisions: Paper Goods, Household Chemicals, Stationery, Impulse Goods, Boyswear, and Girlswear. (*Id.* ¶ 37.) During the relevant time period, Walmart gave Eldridge the following annual performance evaluations and corresponding pay increases:

| Year | Rating | Increase | Department | Evaluating Manager |
|---|---|---|---|---|
| 1999 (90-day) | Meets Expectations | 4% | Paper Goods and Household Chemicals | Shirley Fair |
| 2000 | Exceeds Expectations | 5% | Stationery | Shirley Fair |
| 2001 | Meets Expectations | 4.5% | Impulse Goods | Anthony Hammond |
| 2002 | Meets Expectations | 4% | Boyswear | Edward Rains |
| 2003 | Meets Expectations | 4.5% | Boyswear | Mike Pinkston |
| 2004 | Meets Expectations | $.54 | Boyswear | Joseph Wescott |
| 2005 | Meets Expectations | $.40 | Girlswear | Tommie Purry |
| 2006 | Meets Expectations | $.40 | Girlswear | (Illegible) |
| 2007 | Meets Expectations | $.40 | Housewares | Tommie Purry |
| 2008 | Exceeds Expectations | $.60 | Girlswear | Tommie Purry |
| 2009 | Exceeds Expectations | $.60 | Boyswear/Girlswear | Ashely Netto |
| 2010 | Exceeds Expectations | $.50 | Inventory | Kevin Bender |
| 2011 | Exceeds Expectations | $.50 | Inventory | Ashley Netto |
| 2012 | Exceeds Expectations | $.50 | Fashion and Home | Don Custodi |

(*Id.* ¶ 39.) In addition to the annual performance-based pay increases, Walmart adjusted Eldridge's compensation as follows:

---

[1] Eldridge does not contest the accuracy of Walmart's employment records.

| Year | Reason | Pay Increase or Decrease | Amount |
|---|---|---|---|
| November 1999 | Joined Safety Team | Increase | $.25 |
| January 2000 | Transferred to Department Manager for Stationery | Increase | $.51 (6%) |
| May 2000 | Performed additional duties | Increase | $.51 (6%) |
| June 2000 | Left Safety Team | Decrease | $.25 |
| February 2001 | Failure to perform additional duties | Decrease | $.51 |
| March 2004 | Assumed additional duties | Increase | $.45 (5%) |
| June 2004 | Walmart's new pay structure | Increase | $.46 |
| August 2009 | Voluntarily transferred to a job in a lower pay class (CAP Team Associate 2nd, an inventory job) | Decrease | $.90 |
| August 2010 | Promotion from CAP Team Associate 2nd to CAP Team Supervisor | Increase | $1.30 |
| January 2011 | Promotion to Backroom Zone Supervisor | Increase | $2.00 |

(*Id.* ¶ 38.)

### C.     Pay Discrimination Facts

Eldridge asserts that Walmart paid her less than it paid two male Department Managers—Edward Riley and Gerald Peterson. Eldridge also claims that a Support Manager named Dan (last name unknown), who was previously a Department Manager in Lawn and Garden, told her that he earned more than she did while he was a Department Manager. Finally, Eldridge alleges that a woman named Diane (last name unknown, but possibly Medford or Milford) and Michelle Taylor, a Personnel Manager, told her that women at the New Castle location were paid less than men holding the same positions.

#### 1.     Edward Riley

According to Walmart's employment records, Riley had approximately 18 years of management experience before working for Walmart. (Walmart Decl. ¶ 42.) Walmart hired Riley on June 5, 1999, and he held a stocking position at $7.00 per hour for approximately

5

three months. (*Id.* ¶ 43.) In September 1999, Walmart promoted Riley to Customer Service Manager, and he received a pay increase to $8.50 per hour. (*Id.*)

In May 2000, Riley became the Department Manager for Domestic Goods and his pay increased to $8.84 an hour. (*Id.* ¶ 44.) At the time, Eldridge earned more—$9.53 per hour—as a Department Manager. (*Id.*) In June 2000, Riley became the Department Manager for Curtains, and then he received a pay increase to $9.20 per hour following an annual performance evaluation where he earned the rating "Meets Expectations." (*Id.* ¶ 45.) At the time, Eldridge still earned more than Riley, at $10.10 per hour. (*Id.*)

Eldridge's pay rate continued to be higher than Riley's until April 2001, when he received a $.50 pay increase to $9.70 per hour following an annual performance evaluation where he received the rating "Exceeds Expectations." In the interim, Eldridge's pay had returned to $9.53 per hour, because she had failed to perform the additional duties upon which her prior pay increase was contingent. (*Id.* ¶ 46.) Several months later, in August 2001, Eldridge received her annual performance evaluation and her pay increased to $9.95 per hour. (*Id.* ¶ 47.) She was again making more than Riley as a Department Manager. (*Id.*) Eldridge continued to make more than Riley as Department Managers until Riley became a Support Manager in September 2001. (*Id.*) Riley and Eldridge never worked in the same department. (*Id.* ¶ 48.)

**2.  Gerald Peterson**

Prior to working for Walmart, Peterson worked as a Perishable Manager for a grocery-store chain for approximately three years, and as a Clerk for another grocery-store chain for an additional three years. (*Id.* ¶ 49.) On May 26, 1999, Walmart hired Peterson as a CAP Team Associate 2nd. (*Id.* ¶ 50.) While his initial pay rate was supposed to have been $9.50 per hour,

perhaps due to a mistake, he was paid $7.00 per hour for approximately one month before he received $9.50 per hour. (*Id.* ¶¶ 52–53.)

In October 1999, Walmart promoted Peterson to Department Manager for Pets. (*Id.* ¶ 54.) From that time until October 2012—when Eldridge transferred to California—Peterson also served as Department Manager for Toys, Sporting Goods, Electronics, Lawn and Garden, and Tire and Lube Express (Automotive). (*Id.*) Peterson and Eldridge never managed the same department. (*Id.* ¶ 55.)

Peterson received the following annual performance-based pay increases during the period when he and Eldridge were both Department Managers at the New Castle store:

| Year | Rating | Pay Increase | Department | Evaluating Manager |
|---|---|---|---|---|
| 1999 (90-day) | Exceeds Expectations | 5% | Inventory | Walter Stewart |
| 2000 | Meets Expectations | 4% | Toys | Mike Broyles |
| 2001 | Exceeds Expectations | 5% | Toys | Suzanne Guderian |
| 2002 | Exceeds Expectations | $.59 | Sporting Goods | Anthony Hammond |
| 2003 | Exceeds Expectations | 5% | Sporting Goods | Mike Broyles |
| 2004 | Exceeds Expectations | 5% | Sporting Goods | Brandon Hendrix |
| 2005 | Exceeds Expectations | $.55 | Electronics | Jay Mench |
| 2006 | Exceeds Expectations | $.55 | Electronics | Tommie Purry |
| 2007 | Exceeds Expectations | $.60 | Pets | Radcliffe Sinclair |
| 2008 | Exceeds Expectations | $.60 | Lawn & Garden | Shannon McFadden |
| 2009 | Exceeds Expectations | $.60 | Lawn & Garden | Ashley Netto |
| 2010 | Role Model | $.60 | Inventory | Kevin Bender |
| 2011 | Role Model | $.33 | Tire & Lube (Auto) | Kevin Bender |
| 2012 | Role Model | None | Tire & Lube (Auto) | Donald Custodi |

(*Id.* ¶¶ 57–58.) Walmart also made the following adjustments to Peterson's pay during the relevant time period:

| Year | Reason | Pay Increase or Decrease | Amount |
|---|---|---|---|
| October 1999 | Promotion to Department Manager for Pets | Increase | $.50 (5%) |
| January 2000 | Transfer to Department Manager for Toys | Increase | $.52 (5%) |
| March 2000 | Merit Increase | Increase | $.30 |
| January 2002 | Transfer to Department Manager for Sporting Goods | Increase | $1.00 |
| February 2007 | Transfer to Department Manager for Pets | Decrease | $0.40 |
| October 2007 | Transfer to Department Manager for Lawn & Garden | Increase | $0.40 |

(*Id.* ¶¶ 54–56.) The same manager evaluated both Eldridge and Peterson twice: (1) in 2010, Kevin Bender evaluated them when Eldridge was a CAP Team Associate 2nd and Peterson was a CAP Team Supervisor; and (2) in 2012, Donald Custodi evaluated them when Eldridge was a Zone Manager for Fashion and Home and Peterson was a Department Manager in Tire & Lube Express (Automotive). (*Id.* ¶¶ 39–40; 57–58.)

### 3. "Dan" and "Diane"

After searching its business records, Walmart could not locate a Support Manager or Department Manager for the Lawn and Garden department named "Dan" (or anything for which Dan could be a nickname). (*Id.* ¶ 59.) Further, Walmart could not identify anyone at the New Castle store named Diane Medford or Milford (or any similar name) who worked in a personnel position. (*Id.* ¶ 60.)

### F. Promotional Discrimination Facts

Eldridge also asserts that she experienced promotional discrimination on the basis of her sex on multiple occasions.

### 1. Support Manager

During her deposition, Eldridge testified that she "thinks [she] applied twice" for a Support Manager position and that she did so by approaching an unknown Assistant Store

8

Manager and expressing interest. (*See* Eldridge Dep. at 74:6-23.) After her first application, Eldridge alleges that another employee received the position. The second time, Eldridge testified that she, Riley, and Pearline (Pearl) Robinson received the Support Manager promotion. (*Id.* at 75:10–11.) She further testified that they all signed a paper and were told that they "were support to the assistants." (*Id.* at 75:16–21.) Eldridge then asserts that "a couple of months" after the "promotion," Walmart "announced they were getting rid of the position." (ECF No. 4-5 at 4.) She further asserts that Walmart removed her and Robinson from the Support Manager position, but Riley remained in the position despite Eldridge having more experience than him. (*Id.* at 4–5.)

Eldridge identified the form she believed memorialized her promotion at her deposition—an Associate Commendation form dated May 10, 2000. (*Id.* at 30:5–31:4, 76:9–19; Walmart Decl. ¶ 63, Ex. 7 [ECF No. 4-2 at 29].) On May 10, 2000, Eldridge was working as a Department Manager in Impulse Goods and she signed a form stating that she was taking on greater responsibilities (*i.e.*, working one closing shift each week, working with evening employees on zoning and the importance of getting returns done during the evening, *et cetera*) and received a commensurate pay increase. (Walmart Decl. ¶¶ 62–63.) The form further states: "If [Eldridge] decides to not work one night a week or her [department] becomes substandard because of this extra responsibility[,] she will [lose] her merit increase given to her [and] be expected to fix her [department]." (ECF No. 4-2 at 29.) Her pay rate increased from $9.53 per hour to $10.10 per hour. (*Id.*) The form does not make any reference to the position of Support Manager nor does it mention a promotion. (*See id.*)

9

In December 2000, approximately seven months after Eldridge signed the form, Eldridge's personnel file states: "Melva is not closing and her standards have dropped. As a result[,] her pay will return to base." (Walmart Decl. ¶ 64, Ex. 9 [ECF No. 4-2 at 33]; Eldridge Dep. at 34:19–35:9.)

As to Robinson, Walmart's employment records reveal that she received two pay increases in May 2000 and signed Associate Commendation forms memorializing them. (*Id.* ¶¶ 70–72.) Neither pay increase, however, was related to a promotion or contingent upon Robinson assuming additional responsibilities. (*Id.*) Robinson never held the Support Manager position at Walmart. (*Id.* ¶ 73.) Regarding Riley, neither his pay nor position changed during May 2000, when Eldridge and Robinson received raises. (*Id.* ¶¶ 74–75.) Rather, Walmart promoted Riley to Support Manager more than one year later, in September 2001. (*Id.* ¶ 76.) Eldridge does not assert that she competed with Riley for this promotion.

### 2. Assistant Store Manager

Eldridge alleges that she applied for a promotion to Assistant Store Manager twice while Merl Cordray was Store Manager. (Eldridge Dep. at 85:12–22.) In her answers to interrogatories, Eldridge asserts that she was not promoted because Cordray claimed that he never received her first application and lost her second application. (ECF No. 4-5 at 5; *see also* Eldridge Dep. at 85:23–87:13.)

Walmart located one application by Eldridge for Assistant Store Manager dated April 23, 2004. (Walmart Decl. ¶ 65.) Eldridge does not know who was hired into the position or how many positions were open/filled, if any. (Eldridge Dep. 87:19–25.) According to Walmart's records, it did not promote any associates to Assistant Store Manager from within

10

the New Castle store at the relevant time. (*Id.*) Four associates became Assistant Store Managers around the time Eldridge applied, but all four were transfers from other stores. (*Id.*)

Eldridge also claims that "a couple years" later, she submitted an application for Assistant Store Manager to Michelle Taylor, a Personnel Manager (a non-salaried, non-decisionmaker). (Eldridge Dep. at 88:1–25.) Eldridge, however, did not follow up with Taylor about the status of her application and does not know why she was not selected for the promotion. (*Id.*) She recalled that Walmart selected several other Department Managers for the position. (*Id.* at 88:23–25.)

## II.  STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come

11

forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

### III. ANALYSIS

Eldridge has one disparate treatment claim under Title VII remaining in this lawsuit, which encompasses both pay discrimination and promotional discrimination. The court will address each issue in turn.

### A. Pay Discrimination

There are two ways to establish liability under Title VII for a disparate-treatment claim: (1) "demonstrating through direct or circumstantial evidence that [gender] was a motivating factor in the employer's adverse employment action"; or (2) relying on the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017). The parties agree that Eldridge is proceeding under the burden-shifting scheme in *McDonnell Douglas*. (*See* ECF No. 13 at 15.)

Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of sex discrimination. *McDonnell Douglas*, 411 U.S. at 802. For pay disparity, the plaintiff must show that "(1) she is a member of a protected class, (2) she performed her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive." *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019). The plaintiff must establish her *prima facie* case by a preponderance of the evidence. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). Second, if she succeeds, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Finally, if the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason is pretextual. *Id.*

When a plaintiff relies on a comparator to show a *prima facie* case of discrimination, the comparator must be similarly situated "in all relevant respects." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). For this inquiry, courts consider whether the employees had the same job description and were subject to the same standards; whether they had comparable experience, education, qualifications, and performance; and whether they had the same supervisor(s). *See Spencer*, 919 F.3d at 207. If the two employees are similar in all relevant respects but have different pay, then an inference arises that the pay differential stems from discrimination. *See Swaso*, 698 F. App'x at 748. "[T]he plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but 'similarly-situated in all respects.'" *See Spencer*, 919 F.3d at 207 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Eldridge bases her claim on the alleged pay disparity between herself and two male Department Managers, Riley and Peterson.[2] Walmart argues that Peterson and Riley are not similarly situated to Eldridge and are therefore not proper comparators. The court agrees.

First, Eldridge cannot point to any evidence that she held sufficiently similar jobs to those held by either Peterson or Riley. In other words, Eldridge cannot satisfy her *prima facie* burden solely by comparing her job title with Riley's and Peterson's. *Spencer*, 919 F.3d at 204 ("[W]e have rejected an analogous claim that jobs with the same title and only vaguely corresponding responsibilities can be considered equal."); *Forbes v. Wal-Mart Stores, Inc.*, No.

---

[2] Eldridge also asserted that Walmart paid her less than a male employee named "Dan," but later conceded in her responses to interrogatories that he was a Support Manager—a higher-paid position than Department Manager because it encompasses more responsibilities. (*See* ECF No. 4-5 at 6; Walmart Decl. ¶ 21.) Because Dan worked in a higher-paid position, he cannot be a proper pay comparator. Moreover, Walmart has been unable to locate any employment records for an employee by the name of "Dan" who worked as a Support Manager or Department Manager at the New Castle store during the relevant time period.

17-81225-Civ-Scola, 2019 WL 3859010, at *6 (S.D. Fla. Aug. 16, 2019) (holding that a former *Dukes* class member who worked as a Photo Lab Manager was not similarly situated to a male Meat Processing Manager "in any appreciable way" because she offered no evidence that, among other things, the challenges of the jobs were comparable, that they required the same skills, had similar workloads, or managed the same number of employees).

As noted above, under Walmart's management and pay structure, Department Managers' job duties and pay differ based on a variety of factors including the merchandise sold in the department, the number of employees they supervise, the complexity of their work, and the departments' respective policies and procedures. Walmart asserts that departments such as Sporting Goods and Electronics have more complex procedures than departments such as Impulse Goods. (Walmart Decl. ¶ 13.) For example, the Sporting Goods department has procedures related to the sale of licenses, firearms, and ammunition, and the Electronics department has procedures related to securing and showing electronic (and often pricier) merchandise. (*See id.*) The number of associates also varies depending on the department, which either simplifies the manager's work or makes it more complex. (*Id.*)

It is undisputed that Eldridge never worked as a Department Manager in the same departments as either Peterson or Riley. In response, Eldridge provides only a bare assertion that various Department Managers in different divisions have the "same duties," but she offers no evidence to support her proposition. (*See* Eldridge Dep. at 60:7–9.) Nevertheless, this assertion is belied by the evidence in the record that Department Managers did not have the "same duties." In her own briefing, Eldridge recognizes that Peterson, as Department Manager for Sporting Goods, was responsible for federal government firearms paperwork, fishing

15

licenses, and hunting licenses, which included regulatory paperwork and record-keeping—duties which Eldridge never had in her various roles as Department Manager. (*See* ECF No. 13 at 12; Dep. of Gerald Peterson 43:10–44:21, Jan. 12, 2021 [ECF No. 4-4].) In sum, Eldridge has failed to present any evidence that she had a sufficiently similar job to either Peterson or Riley.

Second, and independently, Eldridge cannot meet the *prima facie* requirement that employees "must have dealt with the same decision-maker." *Popo v. Giant Goods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009). When decision-makers are different, there are insufficient common features between a plaintiff and her comparator to allow for a "meaningful comparison." *Hurst v. D.C.*, 681 F. App'x 186, 193 (4th Cir. 2017) ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently.").

As to Riley, the record demonstrates that he and Eldridge never dealt with the same decision-makers for their annual performance evaluations and corresponding pay increases. Regarding Peterson, different decision-makers performed each of his and Eldridge's annual performance evaluations, with two exceptions in 2010 and 2012. Those exceptions are rendered meaningless, however, because Eldridge and Peterson worked different jobs in 2010, and they worked in different departments in 2012. Because Eldridge cannot demonstrate that she, Peterson, and Riley dealt with the same decision-maker in any meaningful way at any of the relevant times, Riley and Peterson are not similarly situated and Eldridge cannot state a *prima facie* claim of gender discrimination. *See David v. Winchester Med. Ctr.*, No. 5:16-cv-00063,

16

2018 WL 310140, at *12 (W.D. Va. Jan. 5, 2018) (finding that because plaintiff and her comparator "did not report to the same individual, as a matter of law, [he] cannot serve as a comparator").[3]

### B. Promotional Discrimination

To establish a *prima facie* case of promotional discrimination, a plaintiff must show that: "(1) she is a member of a protected class; (2) her employer had an open position for which she applied or sought to apply; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Evans*, 80 F.3d at 959–60. An inference of unlawful discrimination arises when an employer fills the position with an applicant outside of the plaintiff's protected class. *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994). In her complaint, Eldridge alleges that she sought promotions into the roles of Support Manager and Assistant Store Manager on a number of occasions and experienced promotional discrimination. Because the undisputed facts in the record fatally undermine her claim, and Eldridge again fails to establish a *prima facie* case of gender discrimination.

Regarding Eldridge's first application for Support Manager, Eldridge does not provide *any* facts concerning who Walmart purportedly hired instead. As such, there are no facts in the record which theoretically *could* give rise to an inference of unlawful gender discrimination. As

---

[3] Even if Eldridge had stated a *prima facie* case for gender discrimination, Walmart could articulate a legitimate, nondiscriminatory reason as to why Riley and Peterson were paid more than she was (to the extent they were): because they had more prior work experience. While Eldridge had managed a convenience store for approximately three years prior to working for Walmart, Riley had approximately 18 years of management experience, and Peterson had six years of experience working for grocery stores, three of which as a manager. (Walmart Decl. ¶¶ 42, 49.)

17

to Eldridge's second alleged application for Support Manager and latter demotion,[4] the evidence establishes that the claim is based on her flawed recollection or misunderstanding of the events. Eldridge alleges that management selected herself, Riley, and Robinson for the Support Manager position, but that a few months after the promotion, Walmart removed her and Robinson from the position and Riley remained a Support Manager. Eldridge identified the Associate Commendation form dated May 10, 2000, as memorializing her promotion.

But as discussed above, the evidence demonstrates that although Eldridge and Robinson received raises (and signed Associate Commendation forms) in May 2000, neither of their raises were related to a promotion to Support Manager. And the Associate Commendation form signed by Eldridge does not make any reference to the position of Support Manager or mention a promotion—it merely states that she was taking on greater responsibility and receiving a commensurate pay increase. It appears that Eldridge mistook her additional responsibilities and raise as a "promotion" to Support Manager, despite never actually receiving the promotion. Further, it is undisputed that Walmart did not promote Riley to Support Manager until more than a year later, in September 2001, and Eldridge does not assert that she competed with Riley for that promotion. As such, the record demonstrates that Eldridge's purported promotional comparators either (1) never received the promotion to Support Manager (Robinson); (2) or did not apply for and receive the promotion until over a year after Eldridge applied (Riley). In sum, the purported facts upon which Eldridge bases her claim are belied by the undisputed evidence in the record, and Eldridge cannot identify a

---

[4] Because Eldridge does not state a *prima facie* case regarding her alleged demotion from Support Manager, the court need not address whether the claim is time-barred.

single fact indicating that she did not receive a promotion to Support Manager on the basis of her sex.

Finally, as to Eldridge's claim that she was denied promotions to Assistant Store Manager, she has neither identified the gender of the persons she believes were promoted over her nor provided any facts about their comparative qualifications. Based on this glaring deficiency alone, Eldridge cannot show that she was rejected for the position under conditions giving rise to an inference of gender discrimination, and therefore she fails to state a *prima facie* case. And even if Eldridge stated a *prima facie* case for promotional discrimination, assuming the allegations that the Store Manager intentionally lost Eldridge's applications are true, no reasonable jury—based on that sole fact—could conclude that Eldridge did not receive the promotion because of gender discrimination. The court will therefore enter judgment in favor of Walmart on Eldridge's promotional discrimination claim.

### IV. CONCLUSION

For the above reasons, the court will grant Walmart's motion for summary judgment (ECF No. 3). A separate order will issue.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompany Order to all counsel of record.

**ENTERED** this 24th day of August, 2021.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE